# ATTACHMENT

# A

*Redacted Docket Materials*

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY OATH<br>HOLDINGS, INC., FOR INVESTIGATION OF VIOLATION OF<br>18 U.S.C. 371 | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the     Northern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein and included as part of the Affidavit in Support of this Application for a Search Warrant

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud United States |
| 50 U.S.C. § 1705 | Violation of International Emergency Economic Powers Act (IEEPA) |
| 18 U.S.C. § 554 | Smuggling Goods from the United States |

The application is based on these facts:

See attached affidavit incorporated by reference as if fully restated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of     days (give exact ending date if more than 30 days:       ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Sworn to before me and signed in my presence.

Date:     09/06/2018

*Judge's signature*

City and state:    Washington, D.C.      U.S. Magistrate Judge Robin M. Meriweather

*Printed name and title*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH ONE
ACCOUNT CONTROLLED BY OATH
HOLDINGS, INC., FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. 371

Misc. No. _____

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

### AFFIDAVIT OF SPECIAL AGENT JON BENTSEN

I, ████████ being duly sworn, state as follows:

## I.    INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property: (1) a forensic image of ████████████████████████████ (2) a forensic image of ████ ████████████████████████ which are further described in Attachment A.1 and are in the possession of your Affiant, in the District of Columbia, and the extraction from that property of electronically stored information as described in Attachment B. This affidavit is further offered in support of an application for a search warrant for information that is associated with (3) Target Account ████████████████ ("Target Account 1"), which is stored at premises controlled by Google LLC; and (4) Target Account ████████████ ("Target Account 2"), which is stored at premises controlled by Oath Holdings, Inc. These two email accounts (collectively, "Target Accounts") are further described in Attachment A.2. The information to be searched for these accounts is described in the following paragraphs and in Attachment C.1 (Yahoo/Oath Holdings Inc.) and Attachment C.2 (Google LLC),

respectively.  For items (3) and (4), this affidavit is made in support of an application for search

warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Google LLC

and Oath Holdings, Inc. to disclose to the government copies of the information (including the

content of communications) further described in Section I of Attachment C.  Upon receipt of the

information described in Section I of Attachment C, government authorized persons will review

that information to locate the items described in Section II of Attachment C, using the procedures

described in Section III of Attachment C.  Only the warrant and attachments directed to Google

and Oath Holdings (along with separately requested non-disclosure orders) will be served upon

those companies if the Court issues these warrants.[1]



---

[1] The government is simultaneously applying for three separate warrants, one for the two digital images in (1) and
(2); one for the email account controlled by Google (3); and one for the email account controlled by Oath Holdings
(4).  The caption on the three affidavits is different, but the affidavit to each warrant is otherwise identical.



4.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See also* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, a violation of the International Emergency Economic Powers Act ("IEEPA") includes the failure to seek a license from the Office of Foreign Assets Control ("OFAC"), an agency within

the Department of Treasury in the District of Columbia, which constitutes an act or omission within

Washington, D.C.  *See* 18 U.S.C. § 3237.  Finally, the offenses under investigation are the subject

of a grand jury investigation in the District of Columbia.  The forensic images described in

Attachment A.1 are in the District of Columbia, on the person of the Affiant, and will be taken to

the computer forensics lab ████████████████████████████████████████████████

████████████████

     5.     I am investigating the export practices of several ████████████████████

companies owned by ███████████████████████████████████████████████████████

operates several businesses in ███████████████████████████████████████████

████████████████████████████████  The evidence gathered to date demonstrates that

████ from at least January 2014 and continuing until the present, did knowingly conspire with

others, including ██████████████████████████████████████ to defraud the

United States Government in violation of 18 U.S.C § 371.  The evidence also demonstrates that

████ violated United States export and smuggling laws by causing false information to be filed

with the United States Government to conceal the true end-users for the exports, by disguising the

U.S. origin commodities being exported, and by not obtaining the required export licenses from

the United States to export, re-export or transship U.S. origin goods to ████ in violation of 50

U.S.C. § 1705 (IEEPA); 31 C.F.R. Part 560 (ITSR); 15 C.F.R. §§ 730-774 (the Export

Administration Regulations); 18 U.S.C. § 554 (Outbound Smuggling); and 13 U.S.C. § 305

(Unlawful Export Information Activities) (collectively, with 18 U.S.C. § 371, the "Subject

Offenses").

6.      This affidavit is submitted in support of an application for a warrant to search forensic images of ███████████████████████████ further described in Attachment A, both of which were lawfully obtained as a result of a border search of ███ on ████████ when he entered the United States at ████████████████████████ from ████████  The border search revealed relevant emails from Target Accounts 1 ████████████████████████████  Therefore, this affidavit is also submitted in support of an application for a warrant to search those accounts.

7.      As indicated below, there is probable cause to believe that from at least in or about 2014 through the present, ████ has conspired with ████████ and others to illegally export, or to attempt to export, U.S.-origin commodities destined for ████ without the required U.S. export license.  In 2014, ████ through his companies and on behalf of ████████████ ordered ████████████████████████████████████████ ████████████████████████████ described *infra* at Paragraph 22. ██████ is located in ██████████████████ ordered the items through a third party in ██████ and arranged for them to be transshipped from ████████████████ ████████████████████████ are controlled for export by the Department of Commerce for Anti-Terrorism reasons under Export Control Classification Number ("ECCN") ██████  A license is required by OFAC prior to the export, re-export or transshipment of these items to ██████

8.      Other communications show that ████████████ relationship continued beyond 2014.  In 2015, ██████████ communicated via text message about possible changes to U.S. sanctions laws that they thought might benefit them.  In 2017, ████████████

5

communicated via an encrypted messaging application about establishing new enterprises to evade U.S. sanctions laws.

9.      Therefore, the facts set forth herein establish probable cause to believe that evidence, fruits, and instrumentalities of these crimes will be found on the forensic images of ████████████████████████████ as well as in the Target Accounts.

## II.      SUMMARY OF PERTINENT EXPORT LAWS AND REGULATIONS

### A.      IEEPA AND THE SANCTIONS ON IRAN

10.     IEEPA authorizes the President of the United States to impose trade sanctions on a country in response to unusual and extraordinary threats to the national security, foreign policy, and economy of the United States presented by that country.  Beginning in 1995, by Executive Orders and pursuant to the authority in IEEPA, the President of the United States imposed such sanctions on Iran.  Among those sanctions are the ITSR, which were promulgated under the authority of the President's Executive Orders and IEEPA, and which OFAC administers.

11.     Under the ITSR, unless a person obtains an export license from OFAC, or unless an export transaction falls within a limited set of enumerated general licenses or authorizations, goods, technology, or and services may not be exported, re-exported, sold, or supplied, directly or indirectly, from the United States, or by a United States person, wherever located, to Iran.

12.     Specifically, section 560.204 of the ITSR provides:

the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

6

(a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

31 C.F.R. § 560.204.

13.     Section 560.203 of the ITSR provides:

(a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.

*Id.* § 560.203.

14.     Pursuant to IEEPA, 50 U.S.C. § 1705, it is a crime for a person to willfully commit, willfully attempt to commit, willfully conspire to commit, or willfully cause a violation of any license, order, regulation, or prohibition issued under IEEPA.

15.     At no time did the individuals or entities mentioned herein ever apply for or receive a license from OFAC to export any goods from the United States to Iran.

**B.     IEEPA AND THE EXPORT ADMINISTRATION REGULATION**

16.     Also pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001.  66 Fed. Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA regulated the export of goods, technology, and software from the United States.  Pursuant to the provisions of the EAA, BIS promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the

7

policies and provisions of the EAA. *See* 15 C.F.R. § 730.2. In Executive Order 13222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.*, 82 Fed. Reg. 39,005 (Aug. 16, 2017).

17. Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items. 15 C.F.R. §§ 734.2-.3. In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use. The most sensitive items subject to EAR controls are identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1. Items listed on the CCL are categorized by ECCN, each of which has export control requirements depending on destination, end use, and end user.

## C.    <u>UNLAWFUL EXPORT INFORMATION ACTIVITIES</u>

18. Title 13, United States Code, Section 305 (Penalties for Unlawful Export Information Activities) provides:

(a) Criminal Penalties

(1) Failure to file; submission of false or misleading information. Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) (or any successor document) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

(2) Furtherance of illegal activities - Any person who knowingly reports any information on or uses the SED or the AES to further any illegal activity shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both . . . .

19.     At a minimum, for all exports (including exports by U.S. mail) of any commodity valued over $2500.00 or for which an export license is required for shipment outside of the United States, the U.S. seller, manufacturer, exporter, or its shipping agent is required to file detailed information with the United States Government, which enables the government "to prevent the export of certain items to unauthorized destinations and/or end users." *See* 15 C.F.R. §§ 30.1(b), 758.1.[2]  Prior to 2013, this was done by completing a Shipper's Export Declaration ("SED") but now is required to be done electronically by filing Electronic Export Information ("EEI") in the Automated Export System ("AES") with the United States Government.   For each export transaction, pursuant to 15 C.F.R. § 30.6, the following EEI data is required to be filed in AES: (1) the name and address of the U.S. seller, manufacturer, broker (or ordering party), or exporter who will be receiving the primary benefit, usually monetary, from the transaction; (2) the date of export; (3) the ultimate consignee/end user who is located abroad and will actually be receiving the export shipment; (4) the "country of ultimate destination in which the goods are to be

---

[2]In addition to the above, an exporter must also file EEI for exports in the following situations, which based upon the facts currently known do not appear applicable:  (1) for any exports of items subject to the EAR that are destined to Cuba, Iran, North Korea, Sudan or Syria; (2) for any exports of munitions-related and spacecraft components or radiation-hardened microelectronics falling within the "600 series" ECCN or "9x515" export control, which were previously controlled under the U.S. Munitions List; (3) for any exports under license exception Strategic Trade Authorization; (4) for any exports of items subject to the EAR that will be transshipped through Canada to a third destination where the export would require EEI or an export license if shipped directly to the final destination from the United States; (5) for all items exported under authorization Validated End-User; (6) for all exports of items subject to the EAR where any parties to the transaction are listed on Commerce's Unverified List; and (7) for exports to India involving any items that controlled under any ECCN for reasons of crime control and regional stability. 15 C.F.R. §758.1(b).

consumed, further processed, stored, or manufactured;" (5) the method of transportation; (6) the commodity classification number and commodity description; (7) the quantity of units being exported; (8) the value of the goods being exported in U.S. dollars, which should be the same as the selling price to the foreign buyer; (9) the identity and address of any intermediary consignee or authorized shipping agent; and (10) if applicable, the export license number, and ECCN or U.S. Munitions List category code.  15 C.F.R. § 30.6.  Lastly, "[a]ll EEI submitted to AES must be complete, correct, and based on personal knowledge of the facts stated or on information furnished by the parties to the export transaction."  15 C.F.R. § 30.3.  Thus, the filer of the EEI -- whether it be the U.S. seller, manufacturer, broker, or exporter or its authorized agent -- must ensure that all information reported to the government is true, accurate, and complete.  *See* 15 C.F.R. § 758.1(f).

20.    Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including SEDs and EEI filings, is a violation of the EAR.  *See* 15 C.F.R. § 772.1 (EAR defines an "Export control document" to include, among other things, "EEI on the Automated Export System (AES) presented in connection with shipments to any country").  Similarly, concealing information from Commerce or U.S. Customs Service by failing to file EEI in connection with an export also violates the EAR.  *See* 15 C.F.R. § 764.2(g)(1).  Further, the EAR specifically states that "[n]o person may fail or refuse to comply with any reporting or recordkeeping requirement of the EAR."  *See* 15 C.F.R. § 762.4(g)(i).

### D.    OUTBOUND SMUGGLING

21.    Title 18, United States Code, Section 554 (Smuggling Goods from the United States) provides:

10

Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

## III.  STATEMENT OF PROBABLE CAUSE

### A.  <u>BACKGROUND</u>

**Key Individuals and Entities**

22.   is a worldwide manufacturer of scientific instruments for ▮▮▮▮▮ as well as for ▮▮▮▮▮ It is headquartered in ▮▮▮▮▮ and has a network of sales and service offices and representatives throughout the world that handle inquiries within their territory. ▮▮ products are dual-use commodities with both ▮▮▮▮▮ sells some products to the U.S. military. ▮▮▮▮ is ▮▮▮▮ specializing in ▮ ▮▮▮▮ including the ▮▮▮▮▮ can be used to provide specific identification of ▮▮▮▮▮ also specializes in ▮ ▮▮▮▮ that mitigate the threat from ▮▮▮▮▮ ▮▮ customers include many of the ▮▮▮▮▮ ▮▮, as well as civilian clients. ▮▮▮▮ is an authorized ▮▮ seller, with offices in ▮▮▮▮▮ As described below, ▮▮ ordered from ▮▮▮▮

23. ███ is a ████████ national, who is predominately based in ████████ He operates several companies, which appear to be based in ██████████████ for the purpose of importing U.S. and ██████████████ for re-sale. ███ companies are part of ███ ███████████ which is headquartered in █████████████ with offices in ███ ███████████████████████████ One of ████ companies is ████████████ At various times, ████ describes ████████████ as either a ████████ company within the ████████████ that is located at the same address in ████████████ or as a company. Another of ██████████████████ is an ████████ company based in ████████████████████ letterhead also lists a company called ████████ ████████████ also has identified himself as █████████████████████ an ████████████ company with locations in ███████████████████████████ ████████████████████████ uses these companies for procurement purposes. ███ has, directly or indirectly, purchased ████████ since in or about 2011. ████ has never applied for or received a U.S. export license. None of ██████████ appear to be involved in any manufacturing or development. As described below, ████ in fact took orders from █████████ ██████████████

24. █████████ is █████████████████████████ owns ████████████ ████████████████████████████████████████████, opposite of ████████████ ██████████████ According to open source business registration websites, ███████ was established in █████████████ is listed as ██████████████████████████ is listed as the email address for ██████████████ Open-source information indicates that ████████ is an Internet service provider located in ████████ The open source websites lists

12

the web address for ███████████████████ The current website for ██████ indicates
it is under construction.  On the open source business websites, ██████ describes ██████ as
█████████████████████████████████████████████████████████████████████████
██████████████████████████████ As described below, ██████ ordered
U.S. products from ██████

     25.     As a result of the U.S. sanctions against ██████ there is no direct ████████████
between ████████████████ Based on the affiant's knowledge and this investigation,
██████ individuals and companies, including ██████ seeking to illegally obtain U.S. goods
through third parties use other intermediaries and front companies located outside ██████ to convert
██████ currency to U.S. dollars ("USD") for payment of the U.S. goods.   These transactions are
illegal because they impermissibly circumvent the requirement of an OFAC license by laundering
the money through second and third parties to pay USD for the illegal export. This investigation
has revealed ██████ has used entities in ████████████████████████████████
██████ to convert ██████ currency to U.S. dollars to pay for U.S. goods intended for ██████

     26.    ██████████████ made use of another trading company to further their scheme.
█████████████████████████████████████████████████████████████████████████
████████████████ is a trading company established in 2004 by ████████████
████████████████ According to open source information and previous investigation,
██████ specializes in ████████████████ including satellite communications, industrial
supplies and electronic goods in bulk.  Its customers include entities in ████████████████ is
part of the ████████████ which includes ████████████████████ which was established
in 2005 in order to █████████████████████████

27.     Based on my personal knowledge and experience, ██████ and specifically ████
is a top source of imports intended for ████████ and a major transshipment port for illegal
goods destined for ███ Your affiant knows that many ████████████ in ████ are used to
procure or receive U.S.-origin goods intended for customers located in ███ without the required
U.S. export license.  As detailed below, ██████████████ as a transshipper for items he
procured through other companies around the world, including ████████████ intended for
████████ regularly uses ████████████████ to receive items on his
behalf in █████ and ship the items to ████████████

28.     Another company involved in the scheme is ████████████████████
██████████████████ is associated with ████████████ and is located in ████
████ In or about July 2014, ████████████ arranged for the ████████████
systems to be shipped from ████████████████████ on behalf of ████████████
Open source information and information provided by ████████████ lists ████████████
address in an office building in ████ co-located in the same office with another company
identified as ████████████ The web address of ████████████████████ is the
same address used by ████████████████████ is described as a ████ company.
The fax number for ████████████ commercial invoice for the ████████████████
████ is the same fax number for ████████████████████ The phone number
for ████████████ commercial invoice for the ████████████ systems is the
same phone number used by ████████████ The email address used by ████████████
████████████ is the same email address used by ████████████ The affiant
believes that ████████████████████ are linked to ████████████████

14

█████████████ and are used by ████████ as purchasers and/or transhippers for orders intended for ██████

29.    █████████████████████ provided information regarding an attempted transaction with ████████ who identified himself as ██████████████████ When █████████████████ in an attempt to procure U.S. origin commodities from ██████████████ █████████████ stated that the end users were located in the country of ████████ However, during an email conversation ██████████████████ had with ████████ using email address █████████████████ (Target Account 3), ████████ included the signature block:



OFAC and Commerce's licensing systems failed to show any individual or company identified in this affidavit as having applied for or received any license or authorization to export, re-export, or transship U.S. origin commodities to ████████

██████████ **Travel to the U.S. and Interview**

30.    On January 8, 2018, ████ arrived at █████████████████████████ ████████ CBP Officers conducted a secondary inbound baggage inspection and interview of ████ during which ████ stated that he resides in ████████ and was visiting the U.S. to attend the annual █████████████████████████████████████████ stated he was going to be in the U.S. for 11 days. ████ stated that he is a ██████████████████ He also stated he was the ████████████████████████████

15

████████ company with locations in ███████████████████████████████████

████████

    31.    During the course of the secondary inspection, ████ stated that he first met

██████ around 2007, and has acted as the intermediate between ██████████████████

██████████ and ███████████ stated that he obtained quotes on ██████████████

██████████ that ████████ would then sell to the end user, but denied formalizing any

sales. CBP officers also found a "Power of Attorney" document in ████████ name notarized in a

████████ court dated May 1, 2017. The document authorized, among other things, ████████

████████ to represent and act on ██████████



As detailed *infra*, Paragraphs 44-68, ████ identified his company, █████████████████

as the end user of ████████ and his company, ████████████████████████ as the

purchaser of ████████ when in fact the U.S. goods were purchased by ████ and destined

for ██ Your affiant believes that ████████ created a company, ████████

████████ to deceive U.S. manufacturers and other companies into thinking the new company

in ██ is an actual end user, instead of ████

      32.     ██ was in possession of several ████████ including a ████████

████████ provided CBP officers the passwords to all

of the electronics devices. ██ denied that he was buying items from the U.S. and sending them

to ██ in violation of U.S. law.

      33.     Pursuant to their border search authority, CBP detained all of ██ electronic

devices with the assistance of agents from ████████ took possession of

the detained devices and subsequently forensically imaged ████████

████████ On January 12, 2018, ████████

returned ██ devices to ████████ had designated.  On January 16, 2018, ██

████ received the forensic images of ████████

████████ did a cursory search of all the forensic images but only ████████

████████ image appeared to have relevant material.  During

this border search, as described below, your affiant found evidence of export violations.  During

the border search, only a portion of the electronic data was reviewed on the images described at

Attachment A.1.  Therefore, this warrant seeks to conduct a more comprehensive search of the

forensic images described in Attachment A.1.  Some evidence from the limited search is discussed

below.

      **Results of the 2018 Border Search**

34.     Your affiant's review of the forensic images described in Attachment A.1 revealed that the target images contain relevant communications between ██████████ As detailed below, ████████████████████████ contained emails from the Target Accounts which show that ██████████ have conducted commercial transactions involving goods intended for ██████████ since at least November 2011.  Emails from 2014 show in detail that ██████████ conspired to violate the EAR and the ITSR by causing █████ to export items that were transshipped, at ██████████ from ████████████ The ████████████ contained text messages from 2015 between ██████████ regarding possible changes to sanctions laws as well as emails and encrypted messages from 2017 about establishing a new enterprise to evade sanctions laws.

35.     Based on my training and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.   For example, ████████████ contained detailed records, including business-related e-mail messages, business documents such as spreadsheets and presentations, a calendar of business and other activities, and financial records.  These records dated to at least 2008.

**██████████ Relationship Prior to 2014**

36. Emails show that ▮▮▮▮▮▮ have dealt with one another since at least in or about November 2011. All of the emails described in this section as having been sent or received by ▮▮▮▮▮▮ were from Target Account 1 or 2, respectively.

37. On or about November 4, 2011, ▮▮▮▮▮ from Target Account 2, emailed ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ concerning airway bills for a shipment from ▮▮▮▮▮ and requesting ▮▮ arrange the shipment. On or about November 5, 2011, ▮▮ emailed ▮▮▮ at Target Account 2 and informed ▮▮▮ that his cargo had arrived at ▮▮▮▮▮ in ▮▮, and that a ▮▮▮▮▮▮▮ was required to send it "air to air." ▮▮▮▮ at Target Account 2 then emailed ▮▮ at Target Account 1 informing ▮▮ that ▮▮▮▮▮▮ had asked for a copy of the ▮▮▮▮▮ On or about November 8, 2011, ▮▮ at Target Account 1 emailed ▮▮▮ at Target Account 2 and requested ▮▮▮ send ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ On or about November 10, 2011, ▮▮▮▮ from Target Account 2 responded to ▮▮ at Target Account 1 informing ▮▮ that ▮▮▮ was sending two payments to ▮▮ accounts from a ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Your affiant believes that these emails are consistent with ▮ arranging goods to be sent from ▮▮▮▮▮ and then "air to air," likely ▮▮ on behalf of ▮▮▮ an arrangement consistent with the evasion of U.S. export laws, if the transactions involved U.S. goods. The activity is also consistent with ▮▮▮▮▮▮ scheme to evade U.S. export laws as demonstrated by the 2014 ▮▮▮▮▮ as discussed below.

**The 2014 ▮▮▮▮▮▮**

19

38.     Your affiant's review revealed that, beginning in or about January 2014, 

conspired with ███████ to evade U.S. export laws and have ██████ items – ███████████████

– subject to the EAR transshipped from ███████████████████████████████████████████

applied for an export license to ship these items to ██████ as is required by U.S. law.  To avoid export

license requirements, ██████ conspired with ████████ to falsify end user information indicating that

the end user was a █████████████  Any emails referenced in this section and sent or

received by ███████████ were from Target Account 1 or 2, respectively.

39.     On or about January 13, 2014, █████████ emailed ████ regarding an order for ████

██████████████████████████ attached an order acknowledgment form on the letterhead of

██████████████  The web address on the document was ████████████████ and the email

address listed was ██████████████  The order acknowledgment was signed by ████████

██████████████████ and contained ████████████████████  The order to

████████████████████

40.     Later the same day, on or about January 13, 2014, ████ using Target Account 1,

emailed ████████████████████████████████████████████████████████████████

██████████████  Ha responded to ████ at Target Account 1 on or about the same day and attached

a price quotation of ████████████ for the ████████████████████  Your affiant believes

████ was agreeing to purchase the systems at ████████████ and resell them to ████████ for

████████████

41.     On or about January 20, 2014, ████ using Target Account 1, emailed ████████ at

Target Account 2, requesting ████████ to arrange a deposit of ████████████ for the order.  ████

attached a pro forma invoice, ████████████████████████████████████████████████

20

████████████████████████████████████████ had previously agreed to pay

████ The document from ████████████ was on ███████████████ and made out to

████████████████████████████████

42.    On or about February 5, 2014, ████ from ████ emailed ████ at Target Account 1 with instructions on placing this order. ███████████ to submit the purchase order for this order so that ████ could issue a pro forma invoice to ████████████████



43.    On or about March 17, 2014, ████████ at Target Account 2 emailed ████ at Target Account 1, indicating ████████████████████████████████████████ ████████ identified as ██████████████████████████████ attached a copy of the wire receipt.  On the same day, March 17, 2014, ████████ at Target Account 2 sent another email to ████ at Target Account 1, informing ████ that ████████████████████████ ████████████████████████████████████████████████ According to header information, the emails from Target Account 2 were sent from an internet protocol ("IP") address that resolves to ████ Based on my training and experience, I believe this email shows that ████████ was providing payment to ████ through the money changer in ████████

_____

████████████████████████████████████████████████

44. ███ at Target Account 1 emailed ███ later on March 17, 2014, and attached █████████████████████ dated March 18, 2014, for █████████████ ██ responded to ██ in an email later the same day, requesting ███ to complete an █████ ██████ attached to the email and have ███████████████████ █████████████████ as the supplier on line number 2 and the contract/order number on line number 3 was ██████████ The goods were described on line number 5 as ████████ The quantity listed in line number 6 was ███ ███ and the country of final destination in line number 8 was ██████████ The end user line number 1 and the specific end use of the goods line number 7 were left blank for ██ to complete and the end-user to sign and stamp. ████████████████ contained several self-certifications and export restrictions to by ███ including:



(emphasis added).

45. On or about March 18, 2014, ███ at Target Account 1 emailed ████ and attached the same █████████████████████████

22

█████████████ The end user was listed on line number 1 as ███████████████ ███████ The specific end use on line number 7 was left blank. The document indicates it was completed by ███████████████████ and the document was stamped with the ████████ ███████████████

46.    Also on or about March 18, 2014, ██████ at Target Account 1 emailed ██████████ at Target Account 2, asking for the end use of the product even though █████████████ was the designated end user: ████████████████████████████████████████████████ ██████████████████████████████ Based on my training, experience, and knowledge of the investigation, this shows that ██████ was not, in fact, the true end user.

47.    Later the same day, on or about March 18, 2014, ███████████████████ ████████████████ emailed ██████ at Target Account 1, asking ██████████████████████ █████████████████████ Attached was the same ████████████ with the same certifications and export restrictions, on ██████████████████████ responded to ████████ emailing, ██████████████████ even though ████████████████████████████ On or about that same day, ██████████████████ was amended and line number 7, ████████████ ████████████████ now listed ███████████████████████████████████████ The same certifications and export restrictions were contained on ███████████████████

48.    On or about March 18, 2014, ██████ using Target Account 1, instructed ███████████ ██████████████████████████████████ for the first payment for the goods. On March 19, 2014, ██████████████ responded to ████ at Target Account 1, attaching a bank notice indicating the money had been paid to ███████

49.     On or about March 20, 2014, █████ at Target Account 2 emailed ███ at Target Account 1:

████████████████████████████████████████████

Header information for this email shows that it was sent from an IP address that resolves to ███

50.     On or about May 7, 2014, ███ at Target Account 1 emailed █████ at Target Account 2: █████████████████████████████████████████

█████████████

51.     On or about May 14, 2014, █████ at Target Account 2 emailed ███ at Target Account 1, discussing making full payment for ███████████████ also advised ███ the following:

████████████████████████████████████████████

_____

████████████████████████████████████████████

24



(emphasis added).

Header information for this email shows that it was sent from an IP address that resolves to ████

Your affiant believes that ████ was instructing ██████████████████████

██████████████ Your affiant also believes ████ was instructing ██ to falsely

label the goods being shipped to ██████████ because there are exemptions

to the export laws that allow the export of ████████████████████

████

     52.    On or about May 14, 2014, ██████████████████ at Target

Account 1 an email from ████ seeking to do ██████████ and requesting ██ provide

██████████████████████ provided forms for ██ to

complete regarding his companies, and to provide an explanation for sending the goods to

████████ also relayed that ████ could not find information on ████████████

████ on the internet. On or about the same day, May 14, 2014, ████ at Target Account 1 replied

to ██ in an email informing ████████████████████████ had

designated ████████████ Based on my training and experience, I believe these

communications demonstrate ████ intent to conceal ████████████████

     53.    On or about May 15, 2014, ████ at Target Account 1 emailed ████ at Target

Account 2 and attached copies of a proforma invoice pertaining to the ██████████

████████████████████████████ All the

25

documents from ███████████ listed ████████████████████████████ ████████████████████████████ a company associated closely with ███████ as the customer.

54.    ██████ from the ███████████████ emailed ████ at Target Account 1 the following on or about May 20, 2014:



Your affiant believes ████ was seeking to confirm for █████████████████████ ████████

55.    Although ██████ was arranging to send ███████████████████ at Target Account 1 responded to ██████ several minutes later on May 20, 2014, informing ███████

Your affiant believes that ████ was stating that ████████████████████████████ ████████████████████████████

56.    ██████ responded to ██████ email on May 20, 2014, seeking confirmation that ████ ████████████████████████ On May 21, 2014, ████ at Target Account 1 instructed ████ to pick up the completed forms from ███████ at an address listing both ████████████████ ████████████████ then emailed ██████████ attaching a completed ████████████ ████████████████████████████████████████████████

26

█████████ contained the same certifications and export restrictions previously described in paragraph 48. ████████████████████████████████████████████ was listed as ███████████████████████████████ was listed as the country of final destination.  Your affiant believes ██████ was again providing false information concerning the actual end user.

57.    Also attached were two documents on ██████████████████████ on May 14, 2014, from ██████████ described below.

58.    The first document on ████████████████████████████████████ ████████████████████████████████████████ and listed ████████████ ███████████ as the █████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ The second document on ████████████████████████████████████████ was a ████████████████████████████████████████ as being established in 2004 with ██████████ ████████████████████████████████ The document stated that █████████ ████████████████████████████████████████████████████████████ ███████████████████████ Your affiant believes these documents show ████████ relying on representations made by ██████████ concerning the end user and destination of the ████████ goods.

59.    On or about May 22, 2014, ████████████████████████████████ and informed ██████ that the documents should be stamped by ████████████████████████████ at Target Account 1 responded that same day that █████████████████████████████████████

27

███ On May 29, 2014, ████████████ at Target Account 1 that ████ would not accept ██████████████████████████████████████████████ and demanded that █████ ████████████████████████████████████████████████████████████ ███ Your affiant believes ████████████████████████ at Target Account 1 responded to ████████████████████████████████████████████████ ████████████████████ Your affiant believes ███ was stating to ███ that the actual end user was not agreeing to provide their identity.

60. ████████████████████████ email later on May 29, 2014, informing ███ he would use a different customer as the end user on ███████████ ████████████████████████ On or about June 11, 2014, ██████████ emailed ███ at Target Account 1 with a subject line of: ███████████ Ha wrote:



████████████ contained the same certifications and export restrictions previously described in paragraph 44 ███ at Target Account 1 responded to ███ in an email the same day, June 11, 2014, writing, ██████████████████ had been changed to reflect the end user as the ██████████████████████' Your affiant believes this correspondence above shows ████████████ would not accept ██████████████████ to provide a ██████████████████ Your affiant believes that ███ provided ███ with the final false ████████████████████████ and that

the EUC was changed to reflect this new false end user in the June 11, 2014, email from █ to

█ with █████████████ agreed and in the above correspondence accepted this false

information.

61.    On or about June 20, 2014, ████████ emailed █ at Target Account 1 to

inform ████████████████████████████ responded to ███ that

the ████████████████████████████████████████████

████████████ Your affiant believes that ███ continued to rely on the fiction that ████ was selling

████████████████████ also  forwarded ████████████████████

forwarder in █████████████████████████████████, and

the point of contact, ████████████ Your affiant believes that ████ provided the ████████████

████████████████████ could arrange the documents and the export of the goods from ████

████████ However, as detailed below, the goods were not directed from ████████████

██████████████████████████

62.    On or about June 27, 2014, ████ at Target Account 1 emailed ████████ informing

████████████████████████████████████████ Also on

June 27, 2014, ████████████████████████████████████ at Target Account

1, and attached ████████████████████ dated June 25, 2014; and ████████████

██████████████████████████████████████████████████████

████████████████████ The goods being exported were described as

██████████████████████████████████ based on information

provided by ████ falsely listed ██████████████████████████████ as

the ultimate consignee and ██████████████████ as the intermediate consignee. ████████

correctly listed the goods as ███████████████████████████████ with ███████

██████████████████████████████ The date of export was June 25, 2014.

63.     On or about July 3, 2014, ████████████████████ emailed ██ at Target

Account 1, informing ███ that the shipment of █████ had cleared customs and was now at

███████████████████ asked ████ for instructions for the shipment and to provide him

with "documents for export."

64.     On or about July 3, 2014, █████ at Target Account 1 responded to █████ email,

referring ████ to an attached ██████████████████████████ dated July 4,

2014, from ███████████████████████████████████████ in

████████████████████████████████ The total value of the

items on this commercial invoice was ██████████████████ directed ████ to follow these

directions for this commercial invoice: ███████████████████████████████████

███████████████████████████████ also referred ████ to a second attached

commercial invoice with the same information, but with a total value for the goods listed as

███████████████ stated ████████████████████████████████████

████████████████████ Your affiant believes that ████████████ conspired to

undervalue the commercial invoice in order to avoid paying additional taxes on the export of the

equipment from ████████████

65.     On or about July 4, 2014, ████████████████ emailed ████ at Target Account

1 a copy of ███████████████████████████████████ This

██████████████████████████████████████████████████████████████

███████████████████████████ The goods being shipped were identified as

30

███████████████ and referenced and attached commercial invoice number

████████████████████████████████████████████████

██████████████████████████████████ as well as

█████████████ The total value of the items on this commercial invoice was ███████████

66.     On or about July 5, 2014, ████ at Target Account 1 emailed ██████████ at

█████████ requesting ████████████████████████████████████

██████████████████████████ On or about July 6, 2014, ████ sent ███

at Target Account 1 an amended copy of ████████████████████████████

███████████████████████████

67.     On or about July 5, 2014, ████ at Target Account 1 forwarded ████████ at Target

Account 2 a copy of amended ██████████████████████ reflects the ████████

████████████████████████████████████████

68.     On or about July 7, 2014, ████ at Target Account 1 forwarded ████████ at Target

Account 2 a copy of commercial invoice number ████████████████████████████

██████████████████████████ and the same packing list used to ship the items

to ███████████

**Communications Regarding Changes to U.S. Sanctions**

69.     Your affiant also viewed relevant text messages on █████████████████████

phone.      An incomplete search of ██████████████████████ showed numerous texts

between ██████████████ discussing transactions involving U.S. origin goods for delivery to

██████████████

70.    On or about April 3, 2015, ███ texted ███ stating: ██████████ ██████████████████████████████ Your affiant believes this text indicates that the company ██████ which has a presence in ██████████ had goods for ███ and ██████ being detained in the United States for an export issue.

71.    On or about July 2, 2015, ██████████ stating: ██████████ ████████████████████████████████████████ ██████████████████████ Based on the timing of the message, your affiant believes this text references ██████████████████████, by which ███ ████████████████████████████████████████ agreed to provide sanctions relief to ███ in exchange for ████████████████ █████████████████████████████████████████ ██████████ Your affiant believes this text shows that ██████████ continued to have a commercial relationship through at least 2015 and hoped to benefit from possible changes in sanctions law due to ██████ Further, in October 2015, ██████████ asking him to send ██████ a copy of a packing list of products from a U.S. company so that ██████ could arrange the shipment of the U.S. goods from ██████████

**Communications Regarding the Establishment of a New Company to Evade Sanctions**

72.    In or about March 2017, ██████████ communicated about setting up a new company together in ██████████ Based on the communications, several of which are included below, your affiant believes they intended to use the new company to procure goods on behalf of ██████████████████

32

73. On or about March 22, 2017, ████████████ both of whom were using an encrypted messaging application, discussed the possibility of opening a new company together. Your affiant viewed the following messages on ████████████████████



33

Your affiant assesses "free zones" in this context refer to geographic areas where goods can be stored and not subject to additional tax. By registering a ███████ in a free zone in ███████████ could claim a ████████████████████████████████ when the goods were actually being sent to ██████

74.    On or about March 31, 2017, ███████ at Target Account 2 emailed ███ at Target Account 2, attaching a file with links to ████████████████████████████████████ advised ██████



75.    On or about April 26, 2017, ██████████ at Target Account 2 emailed ████ at Target Account 1 and reported:

Your affiant assesses ███████ was communicating that the end user shell company should be in ████

76.    On or about April 27, 2017, ████████ at Target Account 2 emailed ████ at Target Account 1 and explained the following: ████████████████████████████████

████████████████████████████████████████████████████████

77.    Based on email and text communication between ████████████████ traveled to ████ from May 11-15, 2017.  Open source information confirmed ████ registered the new company domain name ████████████████ on August 24, 2017.  The company address listed by ████████████

78.    On or about August 1, 2017, ████ texted ████████ stating: ████████████████

████████████████████████████████████

## BACKGROUND CONCERNING PROVIDERS' ACCOUNTS

79.    On February 7, 2018, letters were emailed to Google's legal department and Yahoo!'s legal department requesting that the content of the Target Accounts be preserved under 18 U.S.C § 2703(f).  On May 21, 2018, a follow up preservation request was sent to the providers.Google LLC is the provider of the internet-based accounts identified as Target Account 1.  Oath Holdings, Inc. is the provider of the internet-based  account identified as Target Account 2.  I shall when convenient refer to Google LLC and Oath Holdings, Inc. as a "Provider" or the "Providers."

80.    The Providers provide their subscribers internet-based accounts that allow them to send, receive, and store e-mails online.   Provider accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as

35

a subscriber's username for other Provider services, such as instant messages and remote photo or file storage.

81.     Based on my training and experience, I know that the Providers allows subscribers to obtain accounts by registering on the Providers' websites.  During the registration process, the Providers ask subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  The Providers typically do not verify subscriber names. However, the Providers do verify the e-mail address or phone number provided.

82.     Once a subscriber has registered an account, the Providers provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. Their subscribers can also use that same username or account in connection with other services provided by the Providers.

83.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a Provider account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on the Provider's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on the Provider's servers for a certain period of time.

84.     Thus, a subscriber's Provider account can be used not only for e-mail but also for other types of electronic communication.   Depending on user settings, user-generated content derived from many of these services is normally stored on the Provider's servers until deleted by the subscriber.   Similar to e-mails, such user-generated content can remain on the Provider's

servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on the Provider's servers for a certain period of time. Furthermore, a Provider subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on a Provider's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a Provider's account may be found within such computer files and other information created or stored by the Provider's subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

85.     Based on my training and experience, I know that the Providers also collect and maintain information about their subscribers, including information about their use of the Provider services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. The Providers also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, the Providers typically collect and maintain location data related to subscriber's use of their services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

37

86.     Based on my training and experience, I know that the Providers also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by the Provider in order to track what devices are using the Provider's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Provider accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Provider account.

87.     Based on my training and experience, I know that the Providers use cookies and similar technologies to track users visiting their webpages and using their products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to the individual Provider.

38

More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as the Provider may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Provider account and determine the scope of criminal activity.

88.    Based on my training and experience, I know that each Provider maintains records that can link different a Provider's accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple accounts of a Provider.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Provider account.

89.    Based on my training and experience, I know that subscribers can communicate directly with a Provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  A Provider typically retains records about such communications, including records of contacts between the user and the Provider's support services, as well records of any actions taken by the Provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

90.     In summary, based on my training and experience in this context, I believe that the computers of each Provider are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for each Provider's subscribers), as well as Provider-generated information about its subscribers and their use of Provider services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide the Provider with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

91.     As explained above, information stored in connection with a Provider account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a Provider account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the Provider can show how and when the account was accessed or used. For example, the Providers typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the Provider

40

account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the Provider account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

92.     In my training and experience and through discussions with other agents, I have learned that e-mail hosting companies, such as Google and Yahoo (now Oath Holdings), maintain computer servers connected to the Internet. Their customers use those computers to send e-mail on the Internet.

93.     Customers can access their accounts on the company's e-mail servers from any computer connected to the Internet.

94.     In addition, e-mail hosting companies generally have storage capacity that allows customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

95.     E-mail hosting companies also typically maintain electronic records relating to their customers. These records include account application information, account access information, and e-mail transaction information.

41

96.     Some e-mail hosting companies can also provide the following additional information associated with a subscriber's account:  calendars; address books; buddy lists; photos, files, data, or other information; and World-Wide Web profiles or homepages.  Google in particular provides subscribers calendar functions.

**TECHNICAL DEFINITIONS**

97.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

        a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

                1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

                2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

                3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices

43

(including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

       b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets

function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

        d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test"

keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the

46

Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for

educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

      n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

          i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P

48

software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

      p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An

49

authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q. "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

98. Imaging a media device, such as a laptop and cell phone, involves capturing data from the target device, bit-for-bit and identical, in a forensically acceptable manner. This image is used as a working copy to search for evidence of criminal activity, while the original media device is preserved. Based on my training, experience, and research, I know that the ███████ ██████████████████████████████████████████████ which was housed in ████████████ ████████████████████████████████, as well as the forensic image of a ████████████████ ████████████████████████ have capabilities that allow them to serve as storage for documents, spreadsheets, emails, contact lists, text messages and other forms of evidence of illegal activity. In addition, ████████████████████████ is also capable of being a digital camera and video player/recorder; a GPS navigation device; a media player; an address book; and a mobile email and texting device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

99.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the Devices.  Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the images for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for at least the following reasons:

a.     Individuals who engage in criminal activity, including violations of the ITSR, the EAR, and IEEPA, use digital devices such as laptop computers and cell phones to conduct business, store business documents and correspondence involving co-conspirators, text or other "Short Message Service" ("SMS") messages, access websites to facilitate illegal activity, store contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

51

      c.   Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

      100.   As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by

agents and others involved in this investigation and in the forensic examination of digital devices,

I respectfully submit there is probable cause to believe that this forensic electronic evidence and

information will be in any of the images of the Device(s) at issue here because:

a.  Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture, movie, or

texting files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and who

has been responsible for creating or maintaining records, documents, programs, applications, and

materials contained on the digital device(s) are, as described further in the attachments, called for

by this warrant.  Those records will not always be found in digital data that is neatly segregable

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

Digital data stored in the Device(s), not currently associated with any file, can provide evidence

of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual

memory paging systems can leave digital data on a hard drive that show what tasks and processes

on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal

information such as online nicknames and passwords.  Operating systems can record additional

data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and

other digital device file systems can record data about the dates files were created and the sequence

53

in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

54

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I know that when an individual uses a digital device to communicate with co-conspirators to evade U.S. export laws, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

101. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

g. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

   h. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

   i. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software

56

requires specialized tools and a controlled laboratory environment, and can require substantial time.

        j.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed,

encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

          k.        Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

          l.        Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected

time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

          m.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

          1.     The digital images described in Attachment A.1 will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

          2.     The analysis of the contents of the digital images may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the digital images, the forensic examiners may examine as much of the contents of the images as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the digital images will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION  TO  SEARCH  AT  ANY  TIME  OF  THE  DAY  OR  NIGHT**

102.     Because forensic examiners will be conducting their search of the digital images in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

**CONCLUSION**

103.     Based on the information described above, I have probable cause to believe, and do in fact believe, that ██████████ and their co-conspirators have violated the Subject Offenses 18 U.S.C. § 371; 50 U.S.C. § 1705 (IEEPA); 31 C.F.R. Part 560; 15 C.F.R. §§ 730-774; 18  U.S.C. § 554; and 13 U.S.C. § 305.

104.     I respectfully submit that this affidavit supports probable cause for a warrant to search the forensic images of (1) ████████████████████ (2) a forensic image of ████████████████████ which are further described in Attachment A.1 and are currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.  I

60

respectfully submit this affidavit also supports probable cause for a search warrant for information which is associated with (3) Target Account 1, which is stored at premises controlled by Google LLC; and (4) Target Account 2, which is stored at premises controlled by Oath Holdings, Inc. These accounts are further described in Attachment A.2.

Respectfully submitted,

Subscribed and sworn to before me on _____

_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A.1

The premises to be searched and seized also include the forensic image of a ████████ ███████████████████████████████████████████████████████████ ████████████████ as well as the forensic image of █████████████████ ████████████████ The digital images are stored in the computer forensics lab for Homeland Security Investigations located at ██████████████████ An external hard drive containing the digital images will be brought to DC on September 5, 2018 and will be returned to ████████ on September 6, 2018 for the execution and further search.



**ATTACHMENT A.2**

The premises to be searched and seized are (1) the e-mail accounts identified as

 (2) other user-generated data stored with

those accounts, and (3) associated subscriber, transactional, user connection information

associated with the accounts, as described further in Attachment C.  For

this information is maintained by Oath Holdings, Inc., located at 701 First Avenue, Sunnyvale,

California 94089, and accepts service of process via email to lawenforcement-request-

delivery@oath.com.  For                          the information is maintained by Google

LLC located at 1600 Amphitheatre Parkway, Mountain View, California 94043 and accepts

service of process via email to USLawEnforcement@google.com.

**ATTACHMENT B**

**Property to be seized**

A.      Evidence, fruits, or instrumentalities of violations of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Part 560, and an ongoing criminal conspiracy to commit these offenses, including records from November 1, 2011 through the present relating to:



1.      All communications between or among █████████████

2.      All communications pertaining to ███████████

3.       All communications pertaining to ████████████

4.      All communications pertaining to ████████████

5.      Any and all documents detailing the purchase, sale, and payment for any U.S. commodities destined for ████ including but not limited to invoices, airway bills, sales orders, and banking information.

6.      The identity of the person or persons who have owned or operated the ███████████████████████ e-mail accounts or any associated e-mail accounts.

7.      The existence and identity of any co-conspirators.

8.      The travel or whereabouts of the person or persons who have owned or operated the ███████████████████ e-mail accounts or any associated e-mail accounts.

9.      The identity, location, and ownership of any computers used to access these e-mail accounts.

10.     Other e-mail or Internet accounts providing Internet access or remote data storage.

11.     The existence or location of physical media storing electronic data, such as hard drives, CD- or DVD-ROMs, or thumb drives.

12.     The existence or location of paper print-outs of any data from any of the above.

## <u>ATTACHMENT C.1</u>

**I.    Search Procedure**

A.    Within fourteen days of the search warrant's issue, the warrant will be served on Oath Holdings, Inc. personnel, who will identify the accounts and files to be searched, as described in Section II below.

B.    Oath Holdings, Inc. will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

C.    Oath Holdings, Inc. will provide the account duplicate to law enforcement personnel.

D.    Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

E.    Law enforcement personnel may review the account duplicate, even if Oath Holdings, Inc. produces it more than 14 days after the warrant issues, subject to the following limitations.  If Oath Holdings, Inc. provided data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view all late-created data that was created by Oath Holdings, Inc., including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

**II.    Accounts and Files to Be Copied by Oath Holdings, Inc. Personnel**

A.    All data files associated with ███████████████ including:

1.    The contents of all e-mail, whether draft, deleted, sent, or received;

2.    The contents of all text or instant messages;

3.    The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content;

4.    The contents of all calendar data;

5.    Lists of friends, buddies, contacts, or other subscribers;

6.    Records pertaining to communications between Oath Holdings, Inc. and any person regarding these accounts and any e-mail accounts associated

with those addresses, including, without limitation, contacts with support services and records of actions taken.

B.    All subscriber and transactional records for the ███████████████ e-mail

accounts and any associated e-mail accounts, including:

    1.    Subscriber information for these and any associated e-mail accounts:

        a.    Name(s) and account identifiers;

        b.    Address(es);

        c.    Records of session times and durations;

        d.    Length of service (including start date) and types of service utilized;

        e.    Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;

        f.    The means and source of payment for such service (including any credit card or bank account number); and

        g.    The Internet Protocol address used by the subscriber to register the account or otherwise initiate service.

    2.    User connection logs for any connections to or from these and any associated e-mail accounts, including:

        a.    Connection time and date;

        b.    Disconnect time and date;

        c.    The IP address that was used when the user connected to the service;

        d.    Source and destination of any e-mail messages sent from or received by the account, and the date, time, and length of the message; and

        e.    Any address to which e-mail was or is to be forwarded from the account or e-mail address.

**III.** **Records and Data to be Searched and Seized by Law Enforcement Personnel**

A.      Evidence, fruits, or instrumentalities of violations of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Part 560, and an ongoing criminal conspiracy to commit these offenses, including records from January 1, 2011 through the present relating to:



1.      All communications between or among ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2.      All communications pertaining to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.      All communications pertaining to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.      All communications pertaining to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.      Any and all documents detailing the purchase, sale, and payment for any U.S. commodities destined for ▮▮▮▮ including but not limited to invoices, airway bills, sales orders, and banking information.

6.      The identity of the person or persons who have owned or operated the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ e-mail accounts or any associated e-mail accounts.

7.      The existence and identity of any co-conspirators.

8.      The travel or whereabouts of the person or persons who have owned or operated the ████████████████████████████ e-mail accounts or any associated e-mail accounts.

9.      The identity, location, and ownership of any computers used to access these e-mail accounts.

10.     Other e-mail or Internet accounts providing Internet access or remote data storage.

11.     The existence or location of physical media storing electronic data, such as hard drives, CD- or DVD-ROMs, or thumb drives.

12.     The existence or location of paper print-outs of any data from any of the above.

13.     All subscriber, transactional, and logging records described in Attachment C.1.II.B above.

## ATTACHMENT C.2

**I.    Search Procedure**

A.    Within fourteen days of the search warrant's issue, the warrant will be served on Google LLC personnel, who will identify the accounts and files to be searched, as described in Section II below.

B.    Google LLC will then create an exact electronic duplicate of these accounts and files ("the account duplicate").

C.    Google LLC will provide the account duplicate to law enforcement personnel.

D.    Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

E.    Law enforcement personnel may review the account duplicate, even if Google LLC produces it more than 14 days after the warrant issues, subject to the following limitations.  If Google LLC provided data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel may view all late-created data that was created by Google LLC including subscriber, IP address, logging, and other transactional data, without a further order of the Court.  Law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

**II.    Accounts and Files to Be Copied by Google Personnel**

A.    All data files associated with ▊▊▊▊▊▊▊▊▊▊▊ including:

1.    The contents of all e-mail, whether draft, deleted, sent, or received;

2.    The contents of all text or instant messages;

3.    The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content;

4.    The contents of all calendar data;

5.    Lists of friends, buddies, contacts, or other subscribers;

6.    Records pertaining to communications between Yahoo and any person regarding these accounts and any e-mail accounts associated with those

addresses, including, without limitation, contacts with support services and records of actions taken.

B.     All subscriber and transactional records for the ████████████ e-mail accounts and any associated e-mail accounts, including:

    1.     Subscriber information for these and any associated e-mail accounts:

        a.     Name(s) and account identifiers;

        b.     Address(es);

        c.     Records of session times and durations;

        d.     Length of service (including start date) and types of service utilized;

        e.     Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;

        f.     The means and source of payment for such service (including any credit card or bank account number); and

        g.     The Internet Protocol address used by the subscriber to register the account or otherwise initiate service.

    2.     User connection logs for any connections to or from these and any associated e-mail accounts, including:

        a.     Connection time and date;

        b.     Disconnect time and date;

        c.     The IP address that was used when the user connected to the service;

        d.     Source and destination of any e-mail messages sent from or received by the account, and the date, time, and length of the message; and

        e.     Any address to which e-mail was or is to be forwarded from the account or e-mail address.

**III.** **Records and Data to be Searched and Seized by Law Enforcement Personnel**

A.      Evidence, fruits, or instrumentalities of violations of Title 50, United States Code,

Section 1705 and Title 31, Code of Federal Regulations, Part 560, and an ongoing criminal

conspiracy to commit these offenses, including records from January 1, 2011 through the

present relating to:



1.       All communications between or among ███████████████

2.       All communications pertaining to ███████████

3.        All communications pertaining to ██████████

4.       All communications pertaining to ████████████

5.       Any and all documents detailing the purchase, sale, and payment for any
         U.S. commodities destined for ██████ including but not limited to invoices,
         airway bills, sales orders, and banking information.

6.       The identity of the person or persons who have owned or operated the
         ██████████████████████████ e-mail accounts or
         any associated e-mail accounts.

7.       The existence and identity of any co-conspirators.

8.     The travel or whereabouts of the person or persons who have owned or operated the ████████████████████ e-mail accounts or any associated e-mail accounts.

9.     The identity, location, and ownership of any computers used to access these e-mail accounts.

10.     Other e-mail or Internet accounts providing Internet access or remote data storage.

11.     The existence or location of physical media storing electronic data, such as hard drives, CD- or DVD-ROMs, or thumb drives; and

12.     The existence or location of paper print-outs of any data from any of the above.

13.     All subscriber, transactional, and logging records described in Attachment C.2.II.B above.