# ATTACHMENT

# A

*Redacted Docket Materials*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | Misc. No. _____ <br><br> **Filed Under Seal** |

## APPLICATION OF THE UNITED STATES
## FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits under seal this *ex parte* application for two Orders pursuant to 18 U.S.C. § 2703(d). The proposed Orders would require AT&T Wireless (hereafter, "AT&T") and T-Mobile Inc. (hereafter, "T-Mobile"), both of which are an electronic communication service providers and/or a remote computing services which accepts legal process in North Palm Beach, Florida (for AT&T), and Parsippany, New Jersey (for T-Mobile), and to disclose certain records and other information pertaining to the wireless telecommunications service customers or subscriber accounts identified as, cellular numbers ███████████ (Target Number 1), ███████████ (Target Number 2), and ███████████ (Target Number 3) (collectively, the "Target Numbers"), as set forth in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Orders. In support of this application, the United States asserts:

## LEGAL BACKGROUND AND JURISDICTION

1. AT&T and T-Mobile are each providers of an electronic communication service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under section 2703(d) to require AT&T and T-Mobile to disclose the items described in Part II of Attachment A. *See* 18

U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.      This Court has jurisdiction to issue the proposed Orders because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district. *See* 18 U.S.C. § 3238. Additionally, the statutes setting forth the federal offenses under investigation, namely 18 U.S.C. § 1956, apply extraterritorially. Finally, the offenses under investigation are the subject of a grand jury investigation in the District of Columbia.

3.      A court order under section 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

**THE RELEVANT FACTS**

4.      The United States is investigating an entity known as ▮▮▮▮▮▮▮ and its owners and operators, for possible violations of Title 18, United States Code, Section 1956 (money laundering).

5. ███████, which has been in operation since November 2011, is an online platform that provides bitcoin "tumbler" services that allow customers to commingle bitcoins in order to conceal the source and/or owner of the bitcoins.

6. Bitcoin is a decentralized virtual currency that is supported by a peer-to-peer network where all transactions are posted to a public ledger, called the blockchain.[1] This feature makes bitcoin pseudonymous – although transactions are visible on the public ledger, each transaction is only listed by a complex series of numbers that do not identify the individuals involved in the transaction. However, it is possible to determine the identity of an individual involved in a bitcoin transaction through several different tools that are available to law enforcement. For this reason, many criminal actors who use bitcoin to facilitate illicit transactions online, e.g. to buy and sell drugs or other illegal items or services, look for ways to make their transactions even more anonymous.

7. The "tumbler" service provided by ███████ works by comingling its customers' bitcoins with other customers' bitcoins prior to conducting any transactions. This process allows ███████ customers engaged in unlawful activity to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoins. ███████ publically advertises this service as a way to ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████ charges a fee for this service ranging from 1% to 3% of the amount laundered. However, the fee is randomized to prohibit anyone from using statistical analysis to identify ███████ transactions.

---

[1] An example of the bitcoin public ledger can be seen at https://blockchain.info.

8.      Bitcoin is designed such that one person may easily operate multiple bitcoin accounts.  By analyzing the blockchain, investigators are able to determine accounts that are controlled by the same person or entity.  Through such analysis, the United States has determined that since November 2011, ███████ has received more than one million bitcoins.  Bitcoin's rapidly fluctuating exchange rate makes it difficult to determine the U.S. dollar value of this quantity over time; however, using the current exchange rate (as of March 6, 2017) of approximately $1,275 to 1 bitcoin, ███████ has received approximately $1.275 billion.  Further analysis reveals that four of the top six senders of bitcoins to ███████ are criminal marketplaces known to law enforcement, namely, ████████████████████████████████ ████████████  Between June 2012 and October 2013, the top sender, █████████████ sent more than 179,000 bitcoins (approximately $228 million using the current exchange rate) to ██████.

9.      ███████ main website is accessible only through a service called The Onion Router ("TOR"), which anonymizes the website's Internet Protocol ("IP") address as well as the IP addresses of users accessing the website.  However, ███████ also operates ██████████, which is a public, non-hidden website that is accessible from any internet browser.  ██████████ is for informational purposes only, providing a link to ██████████ TOR-hidden website and information about how to install TOR.  Among other things, the website explains the use of TOR for evading law enforcement: ██████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████  Law enforcement understands these statements to be an advertisement of ███████ illegal money laundering service, which

in fact appears to be the entirety of their business model.

10.     Law enforcement uses proprietary services offered by several different blockchain analysis companies to investigate bitcoin transactions.  These companies analyze the blockchain in an attempt to identify the individuals or groups involved with bitcoin transactions.  Specifically, these companies create large databases that group bitcoin transactions into "clusters" using heuristics that are based on bitcoin transaction metadata.  Through numerous unrelated investigations, law enforcement has found the intelligence provided by these companies to be reliable.

11.     Law enforcement searched the databases provided through these proprietary investigative services and discovered a cluster of bitcoin transactions that are labeled as "███████ ███" ("Cluster #1").

12.     In reviewing the transactions occurring in Cluster #1, law enforcement noticed that the transactions began in early November 2011, approximately two weeks after ████████ first publicly announced its laundering services.  Law enforcement also noticed that the bitcoins being transferred between the various addresses within Cluster #1 converged into another cluster where they were mixed with numerous other bitcoin addresses (the "Mixing Cluster").  This pattern is indicative of the type of mixing activity that ████████ advertises.  Law enforcement believes that Cluster #1 represents the receipt of bitcoins from ████████ customers, and that the Mixing Cluster represents the laundering process employed by ████████ to obscure the ownership and circumstance of customer bitcoins.

13.     Law enforcement then noticed that, for an approximate two-week period in late October 2011, at a time before any of the Cluster #1 transactions occurred, the Mixing Cluster also received bitcoins from another cluster ("Cluster #2").  The transactions within Cluster #2 followed

a similar pattern to those occurring within Cluster #1 and also converged into the Mixing Cluster. Based on these similarities, and on the timing of Cluster #2, law enforcement believes that Cluster #2 represents bitcoins received from customers prior to the Cluster #1 transactions, and that Cluster #2 also involves bitcoin addresses that are owned and controlled by ███████.

14.     Law enforcement reviewed the metadata of the transactions in Cluster #2 and discovered that some of the transactions were sent from a bitcoin address that is associated with the name ██████████████████. Since these transactions originated at a time before ████████ began publicly advertising services, law enforcement believes that ████████ is an owner or operator of ████████.

15.     ████████████████████████████████████████████

16.     Law enforcement is aware through border crossing checks that ████████ has made frequent trips to the United States since 2013. More specifically he traveled to ████████████████



18.     Through review of subpoena returns and the results of an email search warrant,[2] as well as through public source searches, law enforcement is aware that ████████ has utilized several internet hosting providers based in the United States for its website, including ████████████████████████████████████████████

19.     On February 2, 2017, ████████ Twitter account, ████████ posted public messages that their "mixing" service was having difficulties and that they were working to improve

---

[2] On September 21, 2016, United States Magistrate Judge G. Michael Harvey issued a search and seizure warrant for the Microsoft email account ████████████████████████████

their security issues.  Law enforcement believes that ██████████████████████████
████████████████████████████████████

<u>Target Number 1</u>

20.    In reviewing the metadata of the transactions in Cluster #2 as described above, law enforcement discovered that ████████ used ████████████████████████ (Target Number 1) in registering with the bitcoin exchanger that he used to transact bitcoins.

21.    In addition, ████████ used Target Number 1 and email address ████████████████████ to open digital currency accounts with ████████████ between October 2011 and July 2012.[3]  Law enforcement further discovered that these ██████████ accounts sent funds to a bitcoin exchanger, which is typically a precursor to purchasing bitcoins.

22.    Law enforcement then discovered that the email address ████████████████████ is linked to a Facebook account in the name of ████████████  The profile picture for this Facebook account shows an individual who appears to be ████████, as compared to ████████ passport photo.  As such, law enforcement believes that ████████████████ is an alias used by ████████.

23.    An internet search of publicly available records shows that Target Number 1 is associated with the name ████████████.

24.    Based on the foregoing, law enforcement believes that ████████ has used Target Number 1 since at least 2012 and that Target Number 1 may be assigned to a mobile phone in his possession on his current trip to the United States.



Target Number 2

█████████████████████████████████████████████████████

26.     Law enforcement reviewed his flight reservation information and has discovered that on his reservation he provided ██████████████████████ Target Number 2).

27.     Law enforcement is aware that individuals will often provide phone numbers that are actually being used by them on their flight reservations so that the airline can notify them of any changes to their flight schedule (e.g. to notify them of any delays or cancelations).

28.     Based on the foregoing, law enforcement believes that Target Number 2 is currently being used by ███████ and may be assigned to a mobile phone in his possession on his current trip to the United States.

Target Number 3

29.     On January 30, 2017, United States Magistrate Judge Deborah A. Robinson issued an order pursuant to 18 U.S.C. § 2703(d) for the Twitter account██████████████████

30.     As discussed in the application to that order, that Twitter account was created in January 2017 to promote ████████ laundering services.  The account has continued making postings throughout February 2017, and has recently updated the TOR site link for ██████████ laundering service.

31.     Law enforcement reviewed information provided by Twitter pursuant to the Section 2703(d) order and has discovered that the ████████ account was created using a mobile phone that is assigned █████████████████████ (Target Number 3).

32.     Based on the foregoing, law enforcement believes that Target Number 3 is used by ████████ or his co-conspirators to operate ████████ and may be assigned to a mobile phone in

█████████ possession ████████████████████████████

### International Phone Numbers

33.     Law enforcement discovered through public source searches that Target Number 1 is issued by ████████████ and that Target Number 2 is issued by █████  Both ████████████ and ████████████████████████████  Further public source searches reveal that AT&T provides contractual roaming services for these foreign telecommunications companies. Specifically, when a customer of either ████████████████ uses their cellular device within the United States, their phone calls are made through the AT&T network.  As such, if ████████ or anyone else uses Target Number 1 or Target Number 2 within the United States, AT&T would have custody and control of the requested information.

34.     Law enforcement further discovered through public source searches that Target Number 3 is issued by ████████████████████████████.  Additional public source searches reveal that both AT&T and T-Mobile provide contractual roaming services for this foreign telecommunications company.  As such, if ████████ or anyone else uses Target Number 3 within the United States, either AT&T or T-Mobile (or possibly both) would have custody and control of the requested information.  Therefore, with respect to Target Number 3, the government is requesting an order for each AT&T and T-Mobile.

35.     Law enforcement is aware that criminal co-conspirators often communicate through cellular phones, particularly when they are geographically separated from each other. Based on the foregoing evidence that ████████████████████████████████████ ████████████████████████████████████████ the United States believes that the information described in Attachment A is relevant to ████████ role in the operations of ████████ and may potentially lead to other co-conspirators.  Additionally, the

United States believes that the information about the cell towers used during ███████ cellular telephone calls will help the United States to identify his travels throughout the United States to understand the operations of ███████.

36.     The government is seeking records from February 4, 2017, which is the day before ████████████████████████████████████ Records within that date may allow law enforcement to better determine the nature of the criminal activity.  In addition, the information described in Attachment B may provide information about ███████ patterns of communication and relationships with other persons, including potential co-conspirators, throughout the period of the illicit activity.

## REQUEST FOR ORDERS

37.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.  Specifically, these items will help the United States to identify and locate the individual(s) who own and operate ███████ and to determine the nature and scope of their activities.  Accordingly, the United States requests that AT&T and T-Mobile be directed to produce all items described in Part II of Attachment A to the proposed Order.

38.     The United States further requests that the Orders require AT&T and T-Mobile not to notify any other person of the existence of the Orders, including the subscriber or customer of each account identified in Attachment A.  *See* 18 U.S.C. § 2705(b).  Acting under 18 U.S.C. § 2703(c)(1)-(2), the Government "is not required to provide notice to a subscriber or customer" regarding the proposed Order.  *See* 18 U.S.C. § 2703(c)(3).  Furthermore, this Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic

communications service or remote computing service to whom . . . [the] court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of . . . [the] court order." *See* 18 U.S.C. § 2705(b). Such a "nondisclosure order" must be issued if this Court finds "reason to believe that notification . . . will result in—(1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial." *Id.*; *see In re Application for Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena #GJ2014031422765*, 41 F. Supp. 3d 1, 5 (D.D.C. 2014) ("Once the government makes the required showing under § 2705(b), the court is required to issue the non-disclosure order.").

39.   An order of nondisclosure is necessary because the proposed Order relates to an ongoing criminal investigation that is neither public nor known to the target(s) of the investigation, and its disclosure may alert the target(s) to the ongoing investigation. Once notified, potential target(s) would be prompted to destroy or conceal incriminating evidence, change patterns of behavior to evade future detection, and otherwise attempt to undermine the investigation and avoid prosecution. Accordingly, there is reason to believe that notification of the existence of the proposed Order would seriously jeopardize the investigation, including by giving potential target(s) an opportunity to flee from prosecution, destroy or tamper with evidence, and otherwise seriously jeopardize the investigation. *See* 18 U.S.C. § 2705(b)(2), (3), (5).

40.   Given the complex nature of the criminal activity under investigation, potential involvement of foreign-based perpetrators, and/or foreign-based evidence, the Government anticipates that this investigation will remain ongoing and confidential for the next year or longer.

However, if circumstances were to change such that the requested order of nondisclosure becomes no longer necessary, the Government will notify the Court and seek appropriate relief.

41.     In this matter, the Government also requests that the instant Application and the Order be filed under seal. The Court has the inherent power to seal court filings when appropriate, including the proposed Order. *United States v. Hubbard*, 650 F.2d 293, 315-16 (D.C. Cir. 1980) (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)). More particularly, the Court may seal the Application and Order to prevent serious jeopardy to an ongoing criminal investigation when such jeopardy creates a compelling governmental interest in confidentiality. *See Washington Post v. Robinson*, 935 F.2d 282, 287-89 (D.C. Cir. 1991). For the reasons stated above, the Government has a compelling interest in confidentiality to justify sealing the Application and Orders. *See id.*

Respectfully submitted,

CHANNING D. PHILLIPS
United States Attorney

BY:     /s/ *Kyle T. Bateman*
        Kyle T. Bateman, D.C. Bar No. 996646
        Special Assistant U. S. Attorney
        555 Fourth Street, N.W., Fourth Floor
        Washington, D.C. 20530
        (202) 252-7881
        Kyle.Bateman2@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | Misc. No. _____ <br><br> **Under Seal** |
|---|---|

## ORDER

The United States has submitted an application pursuant to 18 U.S.C. § 2703(d),

requesting that the Court issue an Order requiring T-Mobile Inc. ("T-Mobile"), an electronic

communication service provider and/or a remote computing service which accepts legal process

in Parsippany, New Jersey, to disclose the records and other information described in

Attachment A to this Order. The Court finds that the United States has offered specific and

articulable facts showing that there are reasonable grounds to believe that the records or other

information sought are relevant and material to an ongoing criminal investigation. Furthermore,

the Court determines that there is reason to believe that notification of the existence of this Order

will seriously jeopardize the ongoing investigation, including by giving targets an opportunity to

flee from prosecution; destroy or tamper with evidence; and intimidate witnesses. *See* 18 U.S.C.

§ 2705(b)(2) - (5). The Court also finds that the government has established that a compelling

governmental interest exists to justify sealing the government's Application and this Order.

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 2703(d), that T-Mobile shall,

within ten days of the date of this Order, disclose to the United States the records and other

information described in Attachment A to this Order.

IT IS FURTHER ORDERED under 18 U.S.C. § 2705(b) that T-Mobile shall not disclose

the existence of the Application of the United States, or the existence of this Order of the Court,

to the subscriber of the accounts listed in Attachment A, or to any other person, for a period of

180 days or until otherwise authorized to do so by the Court, except that T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.

IT IS FURTHER ORDERED that the Application and this Order are sealed until otherwise ordered by the Court.

_____

HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

_____

Date

# ATTACHMENT A

## I.        The Accounts

The Order applies to certain records and information associated with customer or subscriber accounts of a wireless telecommunications service provided by T-Mobile, Inc. (hereafter, "T-Mobile"), which accepts legal process in Parsippany, New Jersey.  The T-Mobile account is identified as cellular number ███████████ ("the Account").

## II.        Records and Other Information to Be Disclosed

T-Mobile is required to disclose the following records and other information, if available, to the United States for each of the Accounts, for the time period from February 4, 2017, to the present:

### A.        Information about the customer(s) or subscriber(s) of the Accounts

1.        Names (including subscriber names, user names, and screen names);

2.        Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3.        Local and long distance telephone connection records;

4.        Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5.        Length of service (including start date) and types of service utilized;

6.        Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

7.        Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B.** **All records and other information relating to the Accounts (except the contents of communications), including:**

1. Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

2. Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers), and any other associated header information;

3. Records of complaints, alerts, fraud, or violations of terms of service relating to the customer or subscriber of the Accounts (but not including any confidential communications with legal counsel); and

4. All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)</u>

I, _____, do hereby attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by T-Mobile, and my official title is _____. I am a custodian of records for T-Mobile. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of T-Mobile, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.      All records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.      Such records were kept in the ordinary course of a regularly conducted business activity of T-Mobile; and

      c.      Such records were made by T-Mobile as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.


_____    _____

Date                              Signature

**FILED**

MAR - 7 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE APPLICATION OF THE UNITED
STATES OF AMERICA FOR AN ORDER
PURSUANT TO 18 U.S.C. § 2703(d)

Case: 1:17-mc-00514
Assigned To : Harvey, G. Michael
Assign. Date : 3/6/2017
Description: Miscellaneous

## ORDER

The United States has submitted an application pursuant to 18 U.S.C. § 2703(d),

requesting that the Court issue an Order requiring T-Mobile Inc. ("T-Mobile"), an electronic

communication service provider and/or a remote computing service which accepts legal process

in Parsippany, New Jersey, to disclose the records and other information described in

Attachment A to this Order. The Court finds that the United States has offered specific and

articulable facts showing that there are reasonable grounds to believe that the records or other

information sought are relevant and material to an ongoing criminal investigation. Furthermore,

the Court determines that there is reason to believe that notification of the existence of this Order

will seriously jeopardize the ongoing investigation, including by giving targets an opportunity to

flee from prosecution; destroy or tamper with evidence; and intimidate witnesses. *See* 18 U.S.C.

§ 2705(b)(2) - (5). The Court also finds that the government has established that a compelling

governmental interest exists to justify sealing the government's Application and this Order.

IT IS THEREFORE ORDERED, pursuant to 18 U.S.C. § 2703(d), that T-Mobile shall,

within ten days of the date of this Order, disclose to the United States the records and other

information described in Attachment A to this Order.

IT IS FURTHER ORDERED under 18 U.S.C. § 2705(b) that T-Mobile shall not disclose

the existence of the Application of the United States, or the existence of this Order of the Court,

to the subscriber of the accounts listed in Attachment A, or to any other person, for a period of



2

180 days or until otherwise authorized to do so by the Court, except that T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.

IT IS FURTHER ORDERED that the Application and this Order are sealed until otherwise ordered by the Court.

HON. ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

3/6/17
Date

G MICHAEL HARVEY
U.S. MAGISTRATE JUDGE

# ATTACHMENT A

**III.      The Accounts**

The Order applies to certain records and information associated with customer or subscriber accounts of a wireless telecommunications service provided by T-Mobile, Inc. (hereafter, "T-Mobile"), which accepts legal process in Parsippany, New Jersey.  The T-Mobile account is identified as cellular number ███████████ ("the Account").

**IV.      Records and Other Information to Be Disclosed**

T-Mobile is required to disclose the following records and other information, if available, to the United States for each of the Accounts, for the time period from February 4, 2017, to the present:

  **A.      Information about the customer(s) or subscriber(s) of the Accounts**

   1.      Names (including subscriber names, user names, and screen names);

   2.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   3.      Local and long distance telephone connection records;

   4.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   5.      Length of service (including start date) and types of service utilized;

   6.      Telephone or instrument numbers (including MAC addresses), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   7.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B.    All records and other information relating to the Accounts (except the contents of communications), including:**

1.    Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

2.    Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers), and any other associated header information;

3.    Records of complaints, alerts, fraud, or violations of terms of service relating to the customer or subscriber of the Accounts (but not including any confidential communications with legal counsel); and

4.    All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

      I, _____, do hereby attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by T-Mobile, and my official title is _____.  I am a custodian of records for T-Mobile.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of T-Mobile, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

      a.     All records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

      b.     Such records were kept in the ordinary course of a regularly conducted business activity of T-Mobile; and

      c.     Such records were made by T-Mobile as a regular practice.

      I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.


_____      _____
Date                   Signature